UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE and MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION,<br><br>      Plaintiffs,<br><br>    v.<br><br>KERRAMERICAN, INC., et. al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CV-04-191-B-W<br>)<br>)<br>)<br>)<br>) |

**ORDER ON DEFENDANT DENISON MINES'
MOTION FOR SUMMARY JUDGMENT**

**I. STATEMENT OF FACTS**

On December 15, 2004, the state of Maine and the Maine Department of Environmental Protection (DEP) filed an Amended Complaint against Kerramerican, Inc. (Kerramerican), Black Hawk Mining Ltd. (Black Hawk), and Denison Mines, Inc. (Denison).[1] *Am. Compl.* at 1. The Amended Complaint alleges:

> Defendant, Black Hawk Mining, Ltd. . . . conducted mining operations individually, and later as a partner in a joint venture, with Defendant Kerramerican, Inc. in Blue Hill Maine . . . Defendant Denison Mines, Inc. ("Denison") is . . . the successor to Denison Mines Limited . . . Denison Mines Limited controlled and financed Black Hawk's mining operations in Blue Hill, Maine and/or conducted mining operations along with Black Hawk . . . Defendant Kerramerican, Inc. ("Kerramerican") . . . as a partner in a joint

---

[1] Maine brought its Amended Complaint in part pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 *et seq*. For ease of reference, the Court refers to Kerramerican, Inc., and its predecessor and parent corporations, Keradamex, Inc., and Falconbridge, LTD., respectively, as "Kerramerican," and to Black Hawk Mining, Ltd. and Glencairn Gold Corp. as "Black Hawk."

>venture with Defendant Black Hawk, conducted mining operations in Blue Hill, Maine (the Site).

*Id*. at 3-4.  The Amended Complaint goes on to claim that "[t]he mining operations described . . . have released the metals arsenic, cadmium, copper, lead, silver and zinc to the groundwater and surface water at the Site . . . . These metals are all designated as hazardous substances pursuant to [CERCLA]."  *Id*. at 9.  Counts I and II of the four-count Complaint seek "Reimbursement of Past Response Costs and Declaration of Liability for Future Costs and Natural Resources Damages" under CERCLA and the Maine Uncontrolled Hazardous Substance Sites Law, respectively.  *Id*. at 12-13.  On February 4, 2005, Kerramerican filed a cross-claim against Black Hawk and Denison seeking "to recover clean-up costs for contamination resulting from discharges, releases, and disposal of hazardous substances and hazardous materials . . . ."  *Kerramerican Answer, Affirmative Defenses, and Cross-Claim* at 11 (Docket # 7).[2]  On February 16, 2005, Black Hawk filed an amended cross-claim against Kerramerican and Denison.  (Docket # 17).

Denison moves for summary judgment against Kerramerican and Black Hawk claiming: 1) its actions at the Site did not give rise to operator liability under CERCLA; and, 2) its actions at the Site did not give rise to arranger liability under CERCLA.[3]  *Denison Mem. in Supp. of Mot. for Summ. J*. (Docket # 91) (*Denison Mem.*).

---

[2] On June 28, 2006, the state of Maine and DEP entered into a Consent Decree with Kerramerican.  *Consent Decree* (Docket # 83).  The Consent Decree permits Kerramerican to seek reimbursement from other potentially responsible parties for costs it incurred for remediation of the Site.  *Id.* at 14-15.

[3] Denison also moved for summary judgment based on theories of piercing the corporate veil and alter ego status and based on the provisions of an indemnity agreement.  Although Kerramerican has not waived either issue for phase two – apportionment of costs – it is no longer pursuing a theory of derivative liability against Denison.  *See Kerramerican Mot. for Summ. J.* at 19 n.11 (Docket # 100); *Kerramerican Objection to Denison Mot. for Summ. J.* at 3 n.3 (Docket # 113).  For purposes of liability only, the Court need not address the theories of piercing the corporate veil and alter ego status.  Further, Black Hawk points out that indemnity is a question of allocation of costs, rather than liability.  *See Black Hawk Opp'n to Denison Mem. for Summ. J*. at 4-5 (Docket # 109).  The Court agrees and will not address the indemnity agreement here.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (internal citation omitted). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted). In applying this standard, the record is viewed in the light most favorable to the nonmoving party. *FDIC v. Anchor Props*, 13 F.3d 27, 30 (1st Cir. 1994).

### B. Operator Liability under CERCLA

Section 107(a)(2) of CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Denison argues that it never "owned or operated" the Site within the meaning of this provision and, to the extent it controlled and financed Black Hawk's operations as an investor, these activities are insufficient to impose liability. Denison likens its relationship with Black Hawk to that of a parent to a subsidiary[4]

---

[4] Denison writes that it is "questionable whether the relationship between Denison and Black Hawk even qualifies as a parent-subsidiary relationship in view of the fact that Denison never held a majority ownership

3

and contends that *United States v. Bestfoods*, 524 U.S. 51 (1998), establishes that there is no liability under CERCLA for Denison's attenuated involvement with the Site. Black Hawk and Kerramerican disagree. Also relying on *Bestfoods*, they contend that the evidence, when viewed in the light most favorable to them, generates a genuine issue as to whether Denison was an owner or operator under CERCLA.[5]

### 1. *United States v. Bestfoods*

*Bestfoods* is the seminal case. In *Bestfoods*, the Supreme Court set forth the issue and the answer:

> The issue before us, under [CERCLA], is whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary. We answer no, unless the corporate veil may be pierced. But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.

*Id.* at 55. The distinction, then, is whether Denison's involvement with the Site constituted active participation and control over the operations of Black Hawk or whether it constituted active participation and control over the operations of the facility itself.

*Bestfoods* began with the principle "deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *Id.* at 61 (internal punctuation omitted). Nevertheless, *Bestfoods* offered a basis for CERCLA liability of a parent corporation, saying "nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 64.

---

interest in Black Hawk. Nonetheless, the same general principles apply to the question of whether a shareholder may be deemed to be the operator of a corporation's facility." *Denison Mem.* at 10 n.32.

[5] This dispute is the primary issue involved in Kerramerican's motion for summary judgment against Black Hawk. Because the inquiry into Denison's potential liability as a parent corporation is the same, the Court outlines the following legal framework for both Orders. *See Order on Def. Kerramerican Mot. for Summ. J.*

4

In other words, if "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of," then the "parent is directly liable for its own actions." *Id.* at 64-65 (internal punctuation and citation omitted).

*Bestfoods* acknowledged that "[t]his much is easy to say; the difficulty comes in defining actions sufficient to constitute direct parental 'operation.' Here of course we may again rue the uselessness of CERCLA's definition of a facility's 'operator' as 'any person . . . operating' the facility." *Id*. at 66. The Court resorted to the "ordinary or natural meaning" of the term "operator" and defined it to mean "someone who directs the workings of, manages, or conducts the affairs of a facility." *Id*. Given CERCLA's particular concerns, an operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67.

*Bestfoods* rejected the "actual control test" – where the focus is on the relationship between the two corporations – instead focusing on "the parent's interaction with the subsidiary's facility." *Id.* at 67. *Bestfoods* explained that when considering whether a parent corporation may be held directly liable under CERCLA as an "operator," "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68. The Court went on to say that "[a]ny liabilities [the parent] may have as an *operator*, then, stem directly from its control over the plant." *Id*. (emphasis in original).

The Court also illuminated the proper analysis for individuals who are directors of both the parent and the subsidiary. The mere fact that the parent and subsidiary share

5

common directors is insufficient to impose CERCLA liability on the parent, since "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* at 69. In fact, there is a "general presumption" that "directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary [and] it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 69-70 (internal punctuation and citation omitted). To establish parental liability, the moving party would have to show that, despite this general presumption, the "officers and directors were acting in their capacities as [parent] officers and directors, and not as [subsidiary] officers and directors, when they committed those acts." *Id.* at 70.

### 2. *United States v. Kayser-Roth Corporation*

In *United States v. Kayser-Roth Corp.*, the First Circuit elaborated on *Bestfoods*. 272 F.3d 89 (1st Cir. 2001). *Kayser-Roth* discussed the *Bestfoods* reference to the "norms of corporate behavior" as a bellwether for distinguishing among differing fact patterns as well as *Bestfoods*' clarification that such norms would include the parent's "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Id.* at 100 (quoting *Bestfoods*, 524 U.S. at 72) (internal punctuation omitted). *Kayser-Roth* focused on *Bestfoods'* observation that the "the critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* (internal punctuation and citation omitted). *Kayser-Roth* noted that *Bestfoods* contains "an arguable ambiguity" in that, at one point, the Court "appears to link the operational inquiry to . . . environmental matters . . ." whereas, at other

6

points, *Bestfoods* "articulates the relevant parent-facility relationship more broadly, suggesting an inquiry beyond the parent's direct involvement in pollution-related activities at the plant." *Id.* at 102. *Kayser-Roth* resolved this ambiguity by stating unequivocally that "we think it is clear that direct operator liability requires an ultimate finding of the parent's involvement with 'operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'" *Id.* (quoting *Bestfoods*, 524 U.S. at 66-67).

*Kayser-Roth* concluded that the trial court's determination that the parent had engaged in "just this type and degree of activity" was sufficient to sustain parental liability under CERCLA. *Id.* at 100, 104. In particular, *Kayser-Roth* noted that the trial judge had found that the parent engaged in "pervasive control" of the subsidiary's affairs, including actions regarding environmental matters, such as the parent's approval of the installation of a scouring system that used trichloroethylene, its insistence that its subsidiaries notify the parent's legal department of any governmental or legal contact on environmental matters, and its involvement in the subsidiary's settlement of a prior environmental lawsuit. *Id.* at 92-93.

More notable, however, is *Kayser-Roth*'s focus on the activities of a particular employee of the parent. *Kayser-Roth* observed that one of the executive vice-presidents of the parent had "directly exerted operational control over environmental matters at the [subsidiary's] facility." *Id.* at 103. *Kayser-Roth* pointed out that, because the employee was not an officer or director of the subsidiary, he had "no hat to wear but the parent's . . ." *Id.* After describing in detail the role this vice-president played in the environmental decisions of the subsidiary, the district court found his range of activities to be "probative of Kayser-

Roth's overall control over the handling of [the subsidiary's] pollution problems" and the First Circuit agreed. *Id.* at 104.

### 3. *Denison and Black Hawk*

Like *Bestfoods* and *Kayser-Roth*, at issue here are the specific roles of select employees. Denison readily acknowledges that certain Denison employees served as directors, officers, or employees of Black Hawk and that these employees were engaged in mine development. *Denison Mem.* at 6. Citing *Bestfoods* and *Kayser-Roth* at length, Denison posits the critical issue as the "extent of the shareholder's direct participation in the operation of the facility, not the extent of the shareholder's participation in the management of the subsidiary." *Id.* at 11. Denison maintains that it had no involvement in the operation of the Site during the mining and processing in question.[6] *Id.* at 11-14. Rather, it insists that the activities of these select employees in connection with the Site "were undertaken in their capacities as Black Hawk directors, officers and employees." *Id*. at 6.

---

[6] Denison explains,

> Denison's only direct involvement in any operations at the Site was the diamond drilling program undertaken in 1962 and 1963 as part of Denison's due diligence for its investment in Black Hawk. A Denison employee, John Hogan, served as the lead geologist for the diamond drilling. In 1963, Edward Futterer, another Denison employee, completed a Preliminary Appraisal of the Mine based on the diamond drilling program. Denison did not conduct any further operations at the Site after the diamond drilling program was completed in 1963. Hogan remained on-site as an advisor to Black Hawk after Black Hawk began sinking the main mine shaft underground, but he was not responsible for managing any of the mine development activities undertaken by Black Hawk. When the actual mine sinking began and waste rock and ore was first removed from the mine shaft, Black Hawk employees were in charge of the Site. The Mine Manager was Tom Anderson, and the Mine Superintendent was Bud Roswell. Both men worked for Black Hawk, not Denison. The exploratory drilling work conducted under Denison's direction prior to the shaft sinking by Black Hawk is not a basis for operator liability under CERCLA because it did not result in the disposal of hazardous substances at the site.

*Id.* at 11-12.

In response, Kerramerican points to the testimony of Robert Doyle, Maine's State Geologist, and John Hogan, Denison's project geologist, each of whom testified, according to Kerramerican, that "all operations at the Site were managed and directed by Denison." *Kerramerican Objection to Denison Mot. for Summ. J.* at 3 (Docket # 113) (Kerramerican Objection).[7] Kerramerican asserts that Denison employees John Hogan,[8] Ted Futterer,[9] and

---

[7] In its Opposing Statement of Material Facts, Kerramerican carefully followed the local rules by setting forth each fact Denison asserted and responding. However, at the end of its statement, Kerramerican stated:
> 1. The factual statements set forth above to qualify or deny paragraphs numbered **3-4, 7, 9-12, 20, 24-27, 30-34, 40-41, 43-47, 50, and 52,** supported by the record citations also set forth above.
> 2. The factual statements set forth in Kerramerican's Statement of Undisputed Material Facts in support of its motions for summary judgment, Docket No. 101, paragraphs numbered **4, 7, 10, 14-17, 20, 23-24, 27, 36, 39-44, 46-47, 49-50, 52-64, 70, 73-74, and 86** supported by the record citations also set forth in those paragraphs.

*Kerramerican et al. Opposing Statement of Material Facts* at 16-17 (Docket # 112). Kerramerican explains:
> In setting forth a Statement of Additional Facts, Kerramerican is mindful of Magistrate Judge Cohen's comment in his recommended decision in *Doten's Construction, Inc. v. JMG Excavating & Construction Co., Inc.,* Docket No. 03-134-P-S (Nov. 17, 2004), at n.18, where he stated, "To the extent that JMG intends to rely on factual statements included in its qualifications or denials of paragraphs in the moving party's statement of material facts in support of its arguments, rather than merely to show that facts on which the moving party relies are disputed, the better practice would have been to repeat those facts in its own separate statement of additional material facts." Kerramerican is likewise mindful of Magistrate Judge Kravchuk's recent admonition during a telephonic hearing on September 14, 2006 that repetitive language and statements of fact are to be discouraged. In an attempt to follow not only Local Rule 56(c) but also these judicial directions, and also to avoid adding to the already substantial volume of paper in this case, Kerramerican is cross-referencing the factual statements made in its qualifications and denials, as well as the portions of its Statements of Undisputed Material Facts on file with the Court (Docket No. 101) as its Statement of Additional Facts.

*Id.* at 16 n.2.
Denison replies:
> Given Kerramerican's failure to list new individual facts separately, Denison objects to these new facts and requests that they be stricken. Kerramerican's format is inconsistent with Local Rules. The format employed by Kerramerican is also very confusing. For instance, Kerramerican cites its response to paragraph 3 as a "new fact," but it has admitted the same fact in Denison's paragraph 3. While Denison has attempted to address each "new fact" in a manner consistent with Rule 56(d), due to the unnecessary complexity of this format, Denison denies all facts alleged by Kerramerican unless specifically addressed in this reply.

*Reply of Denison to Kerramerican Statement of Material Facts and Additional Facts* at 1 n.2 (Docket # 133).
The Court agrees with Denison that, as Magistrate Judge Cohen stated, the "better practice would have been to repeat those facts in its own separate statement of additional material facts." *Doten's Construction,*

9

Bud Rowswell[10] had "no hat to wear but Denison's [and] were responsible for planning, managing and directing the exploration and development activities that resulted in the release of hazardous substances at the Site." *Id.* at 5. Finally, Kerramerican asserts that other Denison employees played key roles in connection with the Site.[11] Black Hawk's response

---

*Inc.,* Docket No. 03-134-P-S (Nov. 17, 2004), at n.18. Kerramerican's format does not comply with the local rules and makes it cumbersome for Denison to respond. However, the Court denies Denison's request that the responses be stricken; because the statements of material fact already contain genuine issues of material fact, the argument about Kerramerican's additional facts is moot.

[8] Regarding John Hogan, Kerramerican states,
> John Hogan . . . specifically testified that after completing the exploration work, he and Rowswell served in Denison's supervisory group that oversaw the underground mining development work which resulted in the generation and disposal of waste from which hazardous substances have been released . . . Hogan very clearly testified that he was a Denison employee, not a Black Hawk advisor, before, during and after his time as project geologist at the Site.

*Id.* at 5-6.

[9] Regarding Ted Futterer, Kerramerican states,
> Futterer was . . . also designated by Denison as the "Project Engineer of the Black Hawk operation [with] full responsibility for its planning." In that role, Futterer was responsible, in whole or in part, for negotiating royalty payments and the right to dump tailings into Second Pond with the Maine Mining Bureau and the state legislature, for deciding where to sink the shaft at the Site which in turn determined where waste from underground mining development would be disposed, for the layout of the underground mine workings which determined how much waste would be generated and brought to the surface of the Site . . . . The record evidence also establishes that Futterer was a Denison employee and only a Denison employee during the underground mining development activities at the Site.

*Id*. at 6-7.

[10] Kerramerican calls Denison's portrayal of Rowswell as having no affiliation with Denison a "blatant misrepresentation" stating:
> [T]he record evidence establishes that before, during and after [Rowswell's] time as the Mine Superintendent at the Site, Rowswell, like Hogan and Futterer, was always a Denison employee and was never a Black Hawk employee. As the Mine Superintendent, Rowswell was responsible for directing and managing the underground mining work that brought the waste rock to the surface of the Site and resulted in the release of hazardous substances. As stated by Doyle, who was frequently at the Site in his role as Maine's State Geologist, Roswell "was king of the Denison operation at Blue Hill."

*Id*. at 7.

[11] Kerramerican claims:
> Denison also ignores the key roles other Denison employees played in connection with the Site. E.A. Hart, Denison's Chief of Exploration, and E.J. Lees, another Denison geologist, were responsible for preparing and approving the final layouts of the underground development work. These layouts are precisely the underground areas that were excavated and

echoes Kerramerican's response. *Black Hawk Opp'n to Denison Mem. for Summ. J.* at 7-9 (Docket # 109).

The only thing clear from the mass of materials is that the precise roles of certain Denison employees remain unclear. While Denison strenuously maintains it had no involvement whatsoever in the disposal of hazardous materials at the Site, the collective allegations and responses of both Kerramerican and Black Hawk suggest that this substantially understates Denison's involvement. Viewing the evidence in the light most favorable to Kerramerican and Black Hawk, there is a factual question as to whether Denison's control over the Site was "eccentric under accepted norms of parental oversight of a subsidiary's facility." *Kayser-Roth*, 272 F.3d at 100 (quoting *Bestfoods*, 524 U.S. at 72). A number of factual questions remain unresolved including the exact nature of the roles of multiple employees, whether those employees were acting on behalf of Denison, Black Hawk, or both, and whether their activities had to do with the leakage or disposal of hazardous waste, or compliance with environmental regulations. The Court easily concludes that there is a genuine issue of material fact that forecloses summary judgment to Denison.

---

generated the waste rock that has contaminated the Site. Noel O'Brien, a Denison employee for 24 years, started in 1966 or 1967 as the executive assistant to Denison's General Manager, well before he became a director of Black Hawk. O'Brien was responsible for physically closing down operations at the Site once Denison made the decision to suspend operations and then for marketing the Site to find another company to take on Denison's role. Denison's Vice-President for Corporate Affairs, Kenneth Perry, negotiated the joint venture agreement which resulted in the Site eventually being brought into production in the 1970s . . . . Finally, Denison completely ignores the role played by John Kostuik, Denison's General Manager and Vice-President. Once Denison gained effective control of Black Hawk in 1963, Kostuik also wore the "hat" of President and director of Black Hawk. But prior to that time Kostuik was solely an officer of Denison. It was in that role that Kostuik met with then-Governor Reed, Secretary of State MacDonald, other members of the executive branch, legislators and others to promote Denison's work at the Site.

*Id*. at 9-10.

### C. Arranger Liability under CERCLA

Section 107(a)(3) of CERCLA imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

Denison argues it is not liable under a theory of "arranger liability" because "[a]s previously discussed, Denison's direct involvement in the operations at the site was limited to the exploratory surface drilling activities in 1962 and 1963." *Denison Mem.* at 15. It maintains that there "is no evidence in the record to establish that Denison arranged for disposal of any hazardous substances." *Id*. Kerramerican responds that "Denison's agents were directly involved in the underground mine development which . . . has resulted in . . . the release of hazardous substances. [Denison's employees'] control over that activity gave them constructive control over the waste. As such, Denison is also liable as an arranger under section 107(a)(3)."[12] *Kerramerican Objection* at 17.

The Court agrees with Kerramerican. For reasons similar to those that preclude summary judgment on the issue of operator liability, Denison is also not entitled to summary judgment on the issue of arranger liability. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 447 (6th Cir. 2004). Whatever the ultimate disposition of the case, at the summary judgment stage, the same problems that face Denison on operator liability persist for Denison on arranger liability, namely, the precise nature of Denison's involvement at the Site. Viewed in

---

[12] Black Hawk did not directly respond to the arranger liability issue, presumably concluding that its argument on owner/operator liability addressed this issue as well.

12

the light most favorable to Kerramerican and Black Hawk, there is a genuine issue of material fact as to whether the evidence supports a claim of arranger liability.

## III.  CONCLUSION

The Court DENIES Defendant Denison Mines, Inc.'s Motion for Summary Judgment (Docket # 90).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of March, 2007