UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE and <br> MAINE DEPARTMENT OF <br> ENVIRONMENTAL <br> PROTECTION, <br> <br> Plaintiffs, <br> <br> v. <br> <br> KERRAMERICAN, INC., et. al., <br> <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CV-04-191-B-W <br> ) <br> ) <br> ) <br> ) |

### ORDER ON DEFENDANT KERRAMERICAN'S MOTION
### FOR SUMMARY JUDGMENT AGAINST BLACK HAWK MINING

**I. STATEMENT OF FACTS**

In May 1961, Charles Robbins acquired certain mining rights and associated property interests along the eastern shore of Second Pond in Blue Hill, Maine (the Site). The Site had potential copper and zinc deposits that could be exploited for commercial gain. *Kerramerican Statement of Material Facts* ¶ 1 (Docket # 101) (SMF); *Black Hawk Opposing Statement of Material Facts* ¶ 1 (Docket # 107) (OSMF). That same year, Mr. Robbins transferred those rights and interests to Black Hawk Mining, Ltd. (Black Hawk), a company he incorporated with a small office in Montreal, Canada. SMF ¶ 2; OSMF ¶ 2. Robbins and Black Hawk were not capable of completing the mineral exploration, developing the shaft and underground mine workings, and ultimately mining and milling ore at the Site, so Mr. Robbins actively sought other parties with the necessary technical and financial resources to accomplish those actions. SMF ¶ 3; OSMF ¶ 3.

In 1962, Mr. Robbins entered into negotiations and an eventual agreement with Denison Mines Limited (Denison) "whereby Denison would direct exploration on the property" and "operations [were] to be under the exclusive supervision of Denison's exploration division." SMF ¶ 4; OSMF ¶ 4. Denison assumed control over the Black Hawk project and, by July 1963, was evaluating its economics. SMF ¶¶ 8, 10; OSMF ¶¶ 8, 10. Certain individuals were officers or directors for both Denison and Black Hawk.[1] SMF ¶ 6; OSMF ¶ 6. Indeed, between 1962 and 1967, the majority of Black Hawk directors were officers and/or directors of Roman Corp. and/or Denison.[2] SMF ¶ 43; OSMF ¶ 43. One long-time Denison employee, A.F. Risso, became Black Hawk's comptroller in 1965 and was also named a Black Hawk director in 1964. Mr. Risso was responsible for negotiating the terms and conditions of the mining lease from the state of Maine for the Site. SMF ¶ 24; OSMF ¶ 24. In June 1965, the State issued Mining Lease No. 4 to Black Hawk, limiting authorized mining to the land beneath Second Pond. The land comprising the Site was either owned in fee or leased by Black Hawk. SMF ¶ 25; OSMF ¶ 25.

Development of the mine shaft and underground tunnels at various levels of the shaft resulted in the generation of waste rock which was disposed in the area immediately surrounding the shaft and sloping down to Second Pond or was used as part of the construction/above-ground development activities, primarily around the planned site of the

---

[1] The Court will not recount the names and various positions held – simultaneously with Black Hawk and Denison – by numerous employees. The Court concludes in its Order on Denison's Motion for Summary Judgment that the nature and roles of these employees is unclear. *Order on Denison Mot. for Summ. J*. at 11.

When reviewing motions for summary judgment, the Court is constrained to view the facts in the light most favorable to the non-moving party. In Denison's motion for summary judgment, the Court weighed all reasonable inferences in favor of Black Hawk. Here, again, Black Hawk is the non-moving party and is entitled to have the facts viewed in a light most favorable to it. However, even indulging all inferences in favor of Black Hawk, the Court finds a prominent and undeniable amount of "overlap" among Black Hawk and Denison employees. At this early stage, without more precise elucidation of these roles, the Court cannot conclude that Black Hawk was uninvolved.

[2] Roman Corp., which became a public company in 1964, owned 23% of Denison in 1966. SMF ¶ 40; OSMF ¶ 40.

2

processing mill. SMF ¶ 34; OSMF ¶ 34. In 1966, Denison suspended operations at the Site due to economic and other conditions. SMF ¶ 35; OSMF ¶ 35. At the end of 1966, Denison owned 43.7% of Black Hawk. SMF ¶ 36; OSMF ¶ 36. As a result of the exploration and development activities at the Site, as of December 31, 1967, waste rock and ore were deposited on the Site in the area around the shaft and along the shores of Second Pond. Waste rock was either stockpiled or used as fill in connection with the exploration and development activities. SMF ¶ 51; OSMF ¶ 51.

Sometime shortly after May 1970, negotiations between Kerr Addison[3] and Denison took place concerning the terms and conditions by which a joint venture comprised of Kerr Addison and Black Hawk would restart operations at the Site. The Vice-President of Kerr Addison was the principal negotiator for Kerr Addison; the Vice-President of Corporate Affairs of Denison was the principal negotiator for Denison. SMF ¶ 56; OSMF ¶ 56. The President of Kerr Addison and the now President and Chief Operating Officer of Denison, and still President of Black Hawk, were the ultimate decision makers. SMF ¶ 56; OSMF ¶ 56. The Joint Venture Agreement (JVA) was effective as of September 1, 1970, and provided that Keradamex would serve as manager of the joint venture (JV) and receive 60% interest in it, while Black Hawk would retain 40%. SMF ¶ 61; OSMF ¶ 61.

In November 1972, the Blue Hill JV began to process the zinc and copper ore mined at the Site. Pursuant to the JVA, Kerramerican obtained a 60% interest in the Blue Hill JV and acted as its manager. SMF ¶ 71; OSMF ¶ 71. Mining and milling operations were conducted at the Site until November 1977, when operations were suspended by the Blue Hill JV due to economic force majeure. SMF ¶ 72; OSMF ¶ 72. During the mining and

---

[3] Kerr Addison Mines was the parent of Kerramerican's predecessor, Keradamex. *Kerramerican Mot. for Summ. J.* at 5 (Docket # 99).

milling operations, a Blue Hill JV management committee met several times a year to discuss the status of the joint venture operations at the Site and to approve budgets and review expenses and profits. Representatives from both Kerramerican and Black Hawk were present at the first meeting. SMF ¶73; OSMF ¶ 73. Between January 1973 and May 1978, the Blue Hill JV management committee met 15 times to review operations, account balances, and other management issues. Black Hawk's representatives were present at these meetings as well. SMF ¶ 74; OSMF ¶ 74.

When operations at the Site were suspended in 1977, the mine was initially placed on a care and maintenance program with the hope that operations would restart. By the end of 1980, however, the Blue Hill JV decided to close the mine and began rehabilitating the Site, including a significant amount of work on environmental control measures in the tailings areas. SMF ¶79; OSMF ¶ 79. Through October 31, 1980, the JV had incurred mine closure costs which were apportioned between Kerramerican and Black Hawk on a 60% - 40% basis.[4] SMF ¶ 80; OSMF ¶ 80. Black Hawk's 40% share of the mine closure costs was consistent with its obligations under the JVA and Black Hawk made no claim that it was entitled to be indemnified by Kerramerican. SMF ¶ 81; OSMF ¶ 81. Subsequent Black Hawk Annual Reports acknowledged this obligation in the Notes to Consolidated Financial Statements – "[t]he company is responsible for its proportionate share of the joint venture's expenses which at the present time relate primarily to the final rehabilitation of the mine site." SMF ¶ 82; OSMF ¶ 82.

---

[4] Black Hawk objects to this statement "to the extent the 'costs' may be characterized as 'response costs' or necessary for rehabilitation of the site or consistent with the National Contingency Plan. Such characterization is inadmissible without adequate foundation from a qualified witness and therefore cannot be considered for the purposes of a summary judgment motion. Subject to this objection, Black Hawk admits the facts in this paragraph." OSMF ¶ 80.

From 1980 through 1985, the Blue Hill JV engaged in mine closure activities under the oversight of the Maine Department of Environmental Protection (DEP). The Blue Hill JV management committee was briefed extensively on those activities at its meetings during that time period. SMF ¶ 83; OSMF ¶ 83. To fill and close the mines and to reduce metal leaching at the Site, waste rock from around the mine site was used as fill. SMF ¶84; OSMF ¶ 84. In 1985, the Maine DEP approved the Site closure. SMF ¶ 86; OSMF ¶ 86.

Kerramerican now moves for summary judgment against Black Hawk. Its motion concerns: (1) its own contribution claims under CERCLA, (2) its own common law contribution claim; (3) its request for declaratory judgment; (4) summary judgment against Black Hawk's contribution claims under CERCLA; (5) summary judgment against Black Hawk's common law contribution claim; (6) summary judgment against Black Hawk's negligence claim; and, (9) summary judgment against Black Hawk's breach of contract claim.[5]

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).

---

[5] Black Hawk moves to strike all portions of Kerramerican's motion for summary judgment that "seek relief on issues pertaining to matters reserved for the second phase of this trial. This motion includes, but is not limited, to Kerramerican's request for relief on common law contribution, indemnification and declaratory relief actions which are not currently before the Court." *Black Hawk's Opp'n to Kerramerican Mot. for Summ. J.* at 4 (Docket # 111). The Court agrees that these issues are questions of allocation of costs, rather than liability, and would be properly considered in phase two. *See Order on Def. Denison Mines' Mot. for Summ. J.* at 2 n.3. The Court will only address the issues pertaining to liability. For example, even though Kerramerican raises Black Hawk's claim for indemnification, the Court will not address this issue, since indemnity is not a question of liability, but one of allocation of costs.

5

"Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (internal citation omitted).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  In applying this standard, the record is viewed in the light most favorable to the nonmoving party.  *FDIC v. Anchor Props*, 13 F.3d 27, 30 (1st Cir. 1994).

### B.  The Consent Decree

Although there is substantial factual agreement between Kerramerican and Black Hawk, they do not agree on a central issue:  the effect of the consent decree entered into between Kerramerican and the state of Maine and the DEP.  In its Statement of Material Facts, Kerramerican includes ten paragraphs concerning DEP inspections of the Site, revealing contamination and hazardous substances in the soils around the Site and actions, physically and financially, taken by Kerramerican in response.  SMF ¶¶ 87-95, 100.  Black Hawk objects to each paragraph on the ground that "the referenced facts are not admissible and therefore cannot be considered for the purposes of a summary judgment motion . . . . The facts asserted in the Consent Decree are based on hearsay within hearsay and the Consent Decree may not be used against Black Hawk for this purpose."[6]  OSMF ¶¶ 87-95, 100.  Subject to its objections, however, Black Hawk "admits that Kerramerican entered into the

---

[6] The language used in each objection is not exactly the same.  However, the general grounds for Black Hawk's objection are:  that the facts in the Consent Decree are inadmissible or that the statements in Kerramerican's Statement of Material Facts reference these inadmissible facts.  In either event, Black Hawk contends that such statements may not be considered for summary judgment purposes.

Consent Decree with Plaintiffs," OSMF ¶ 88, and, generally, "that the matters asserted in the above referenced documents are asserted in the manner described [by Kerramerican] above." OSMF ¶¶ 87, 89-93, 95.

The Court has separately visited this issue. In Black Hawk's own motion for summary judgment, it maintained that the only record evidence that Kerramerican offered to demonstrate liability was the Consent Decree entered into by Kerramerican and Maine and the DEP.[7] It stated that because "a liability judgment cannot be entered against Black Hawk based only upon a Consent Decree entered by unrelated parties," Kerramerican has not produced *any* record evidence that would establish that it has incurred response costs. *Black Hawk Reply to Kerramerican's Objection to Black Hawk Mot. for Summ. J.* at 5 (Docket # 126). In response, the Court stated:

> The case is presented in an unusual posture, because the parties agree that Kerramerican has deposited in excess of $11,000,000.00 in two accounts pursuant to a court-approved Consent Decree. *Consent Decree*; *Stipulation of Costs*. Of this amount, the Stipulation states that Kerramerican has deposited $8,980.00 in costs for remedial action. *Stipulation of Costs* at 2. Even though there is no other evidence of the amount of remediation costs, as a practical matter, this evidence is sufficient to survive summary judgment on whether Kerramerican has sustained some remediation costs on the Blue Hill site, especially since the Court is constrained to view the evidence in the light most favorable to the non-moving party, Kerramerican. Even if the record evidence is less than what is typically adduced in a CERCLA case, there remains a genuine issue of material fact, since the record evidence now reveals what is already apparent to all parties: Kerramerican has incurred considerable response costs and should be permitted to seek reimbursement from other potentially liable parties.

---

[7] On June 28, 2006, the Court approved a Consent Decree entered into between the state of Maine and the DEP and Kerramerican and its predecessor and parent corporations, Keradamex and Falconbridge Limited, respectively. *Consent Decree* (Docket #83). The Consent Decree provides that "[t]he costs to design and implement those remedies have been estimated at approximately $9 million." *Id*. at 9.

7

*Order on Black Hawk Mot. for Summ. J*. at 8.  Black Hawk now reiterates this argument in its Opposition to Kerramerican's Motion for Summary Judgment.  *Black Hawk Opp'n to Kerramerican Mot. for Summ. J*. at 9 (Docket # 111) (*Black Hawk Opp'n*).

In Black Hawk's motion for summary judgment against Kerramerican, the Court was constrained to view the evidence in the light most favorable to Kerramerican.  Here, in Kerramerican's motion for summary judgment against Black Hawk, the Court is constrained to view the evidence in the light most favorable to Black Hawk.  However, the Court once again declines to ignore the obvious.  At the very least, Kerramerican has submitted a "Stipulation of Costs Incurred" as record evidence that Kerramerican did incur "response costs" approximately totaling $9 million.

Black Hawk next asserts:

> Assuming, for the sake of argument, that Kerramerican is able to establish, with admissible evidence, it has incurred necessary and recoverable response costs consistent with the National Contingency Plan, the status of the evidence is certainly not sufficient to remove all genuine issues of material fact on the subject, particularly when viewed in a light most favorable to Black Hawk. The "response costs" referenced by Kerramerican (and objected to by Black Hawk) can legitimately be characterized as speculative, unnecessary and excessive. Whether or not such a characterization is appropriate is a matter for the fact-finder to determine at trial.

*Black Hawk Opp'n* at 9.  For its part, Kerramerican states:

> Kerramerican has undeniably incurred response costs in connection with its remedial investigation and feasibility study of the Site and in funding the implementation of the selected remedial actions at the Site. SMF ¶¶ 91, 95, 100. While arguing that response costs are "inconsistent with the NCP is a defense to the recoverability of particular response costs, [it is] not a defense to liability for those costs." *American Special Risk Ins. Co. v. City of Centerline*, 2002 WL 1480821, at *13 (E.D. Mich. 2002). Accordingly, for purposes of the liability phase of

> this litigation, it is enough that Kerramerican has incurred response costs and this issue need not be addressed.

*Kerramerican Mot. for Summ. J.* at 14-15.

Even though the Court agrees with Black Hawk that the evidence concerning response costs is slender, whether Kerramerican's response costs were "inconsistent with the National Contingency Plan" concerns allocation, not liability. *Reardon v. United States*, 947 F.2d 1509, 1519 (1st Cir. 1991) ("Whether the response costs were incurred consistently with the national contingency plan is an issue which may be highly factual, but it is usually a matter of the amount, and not the existence, of liability."). Black Hawk is free to press this issue in phase two, but it is no answer to Kerramerican's motion for summary judgment on the issue of Black Hawk's liability.

### C. Contribution Claims under CERCLA

The Supreme Court has commented, "CERCLA both provides a mechanism for cleaning up hazardous-waste sites . . . and imposes the costs of the cleanup on those responsible for the contamination." *Penn. v. Union Gas Co.*, 491 U.S. 1, 7 (1989), overruled on other grounds, *Seminole Tribe v. Florida*, 517 U.S. 44 (1996).[8]  Black Hawk's primary

---

[8] Section 113 of CERCLA provides:

> (1) Contribution. *Any person may seek contribution from any other person who is liable or potentially liable under section 107(a)* [42 U.S.C. § 9607(a)], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a) [42 U.S.C § 9607(a)]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107 [42 U.S.C. § 9606 or 9607].
>
> (2) Settlement. A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the

argument seems to be that, because Kerramerican is a private party seeking contribution under § 113, it must prove as part of its *prima facie* case that response costs incurred were necessary and consistent with the National Contingency Plan. *Black Hawk Opp'n* at 7. Black Hawk cites *Dedham Water Co. v. Cumberland Farms Dairy*, 889 F.2d 1146, 1150 (1st Cir. 1989), which states:

> The statute specifically provides for a private right of action. There are four elements necessary for a prima facie case in a private-party lawsuit under CERCLA: 1. The defendant must

---

> settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
>
> (3) Persons not party to settlement.
> (A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability
> (B) *A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).*

42 U.S.C. § 9613(f) (emphasis added).

   Section 9607(a) sets forth the scope of "covered persons" subject to CERCLA liability:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

42 U.S.C. § 9607(a).

> fall within one of four categories of covered persons. 2. There must have been a release or threatened release of a hazardous substance from defendant's facility. 3. The release or threatened release must cause[] the incurrence of response costs by the plaintiff. 4. The plaintiff's costs must be necessary costs of response . . . consistent with the national contingency plan [NCP].

*Id*. (internal citation and punctuation omitted).

In its motion for summary judgment, Kerramerican methodically plods through the relevant legal framework, demonstrating that: (1) Black Hawk is a person, (2) the Site is a facility, (3) the Site is contaminated by hazardous substances, (4) there has been a release at the Site, (5) Kerramerican has incurred response costs, and (6) Black Hawk was both an owner and an operator at the time of the disposal. *Kerramerican Mot. for Summ. J*. at 12-18. Black Hawk's response[9] is that, based on the record evidence, there is nothing to establish that the Kerramerican response costs were necessary and consistent with the NCP. According to Black Hawk, then, Kerramerican fails to satisfy the fourth element of a *prima facie* case for a § 113 contribution claim.

Black Hawk's argument ignores the express judicial finding in the Consent Decree: "WHEREAS, the DEP asserts and the Court finds that all Response and Oversight Costs incurred or to be incurred by the DEP are not inconsistent with the NCP, 42 U.S.C. § 9605, 40 C.F.R. Part 3000 . . . ." *Consent Decree* at 3. Black Hawk's arguments against the Court's finding are necessarily unavailing. To the extent that Black Hawk is contending that the language "not inconsistent with the NCP" does not mean "consistent with the NCP," the Court is unwilling to parse the language. For purposes of summary judgment on the sole issue of liability, the Consent Decree, at the very least, establishes that Kerramerican has

---

[9] Black Hawk spends some time discussing whether Kerramerican is entitled to bring a § 107 claim, notwithstanding the fact that Kerramerican is not bringing a § 107 claim. The Court will not address the merits of this argument but will, instead, focus on the § 113 contribution claim at issue.

sustained some costs consistent with the NCP; the larger question of the extent to which Kerramerican's response costs were consistent with the NCP is reserved for phase two and the question of apportionment. In any event, EPA regulations provide that "[a]ny response action carried out in compliance with the terms of . . . a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii).

## III. CONCLUSION

The Court concludes that Kerramerican has satisfied the four elements necessary for a *prima facie* case for a private party seeking contribution under CERCLA and GRANTS Kerramerican's Motion for Summary Judgment Against Black Hawk (Docket # 99).[10]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of March, 2007

---

[10] Finding that Black Hawk is liable for purposes of contribution under CERCLA and granting Kerramerican's motion for summary judgment on the issue of liability, the Court need not address, at this point, Black Hawk's additional arguments concerning negligence and breach of contract.