UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE and ) | |
| MAINE DEPARTMENT OF ) | |
| ENVIRONMENTAL ) | |
| PROTECTION, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CV-04-191-B-W |
| ) | |
| KERRAMERICAN, INC., et. al., ) | |
| ) | |
| Defendants. ) | |

### ORDER ON DEFENDANT KERRAMERICAN'S MOTION
### FOR SUMMARY JUDGMENT AGAINST DENISON MINES, INC.

**I.  STATEMENT OF FACTS[1]**

In May 1961, Charles Robbins acquired certain mining rights and associated property interests along the eastern shore of Second Pond in Blue Hill, Maine (the Site). The Site had potential copper and zinc deposits that could be exploited for commercial gain. *Kerramerican Statement of Material Facts* ¶ 1 (Docket # 101) (SMF); *Denison Resp. to Statement of Material Facts* ¶ 1 (Docket # 116) (RSMF).[2]  That same year, Mr. Robbins

---

[1] There is substantial disagreement as to the facts. At bottom, however, Denison's contention is that its legal relationship with Black Hawk does not give rise to operator liability under CERCLA, which is Kerramerican's basis for its motion for summary judgment against Denison. As such, regardless of the numerous points in dispute between Denison and Kerramerican, the Court recounts and focuses on those facts that illuminate the critical relationship, namely that between Denison and Black Hawk.

[2] Denison initially moves to strike a number of statements in Kerramerican's Statement of Material Facts as "irrelevant to the operator theory of liability that is the basis for Kerramerican's motion for summary judgment against Denison." *Denison Resp. to Statement of Material Facts* at 1 (Docket # 116).  The Court denies Denison's request and will provide the information as background to the current dispute.

transferred those rights and interests to Black Hawk Mining, Ltd. (Black Hawk), a company he incorporated with a small office in Montreal, Canada.  SMF ¶ 2; RSMF ¶ 2.

In 1962, Mr. Robbins entered into negotiations and an eventual agreement with Denison Mines Limited (Denison).  SMF ¶ 4; RSMF ¶ 4; *see also Denison Statement of Material Facts* ¶ 10 (Docket # 92).  Several individuals were officers or directors for both Denison and Black Hawk.[3]  SMF ¶ 6; RSMF ¶ 6.  One long-time Dension employee, A.F. Risso, became Black Hawk's comptroller in 1965 and was also named a Black Hawk director in 1964.  Mr. Risso was among those individuals responsible for negotiating the terms and conditions of the mining lease from the state of Maine for the Site.  SMF ¶ 24; RSMF ¶ 24.  In June 1965, the State issued Mining Lease No. 4 to Black Hawk, limiting authorized mining to the land beneath Second Pond.  The land comprising the Site was either owned in fee or leased by Black Hawk.  SMF ¶ 25; RSMF ¶ 25.  By the end of 1966, Denison owned 43.7% of Black Hawk.  SMF ¶ 36; RSMF ¶ 36.

On September 1, 1970 a Joint Venture Agreement (JVA) between Keradamex[4] and Black Hawk became effective; it provided that Keradamex would serve as manager of the joint venture (JV) and receive 60% interest in it, while Black Hawk would retain 40%.  SMF ¶ 61; RSMF ¶ 61.  In November 1972, the Blue Hill JV began to process the zinc and copper ore mined at the Site.  Pursuant to the JVA, Kerramerican obtained a 60% interest in the Blue Hill JV and acted as its manager.  SMF ¶ 71; RSMF ¶ 71.  Mining and milling operations were conducted at the Site until the late 1970s.  SMF ¶ 72; RSMF ¶ 72.  During the mining and milling operations, a Blue Hill JV management committee met several times a year to

---

[3] The Court will not recount the names and various positions held – simultaneously with Black Hawk and Denison – by numerous employees.  The Court concludes in its Order on Denison's Motion for Summary Judgment that the nature and roles of these employees is unclear.  *Order on Denison Mot. for Summ. J.* at 11.

[4] Keradamex was Kerramerican's predecessor.  Kerramerican Statement of Mot. for Summ. J. at 9 (Docket # 100).

discuss the status of the joint venture operations at the Site and to approve budgets and review expenses and profits. Representatives from both Kerramerican and Black Hawk were present at the first meeting. SMF ¶ 73; RSMF ¶ 73. Between January 1973 and May 1978, the Blue Hill JV management committee met several more times. SMF ¶ 74; RSMF ¶ 74.

When operations at the Site were suspended in 1977, the mine was initially placed on a care and maintenance program with the hope that operations would restart. By the end of 1980, however, the Blue Hill JV decided to close the mine and began rehabilitating the Site, including a significant amount of work on environmental control measures in the tailings areas. SMF ¶ 79; RSMF ¶ 79. From 1980 through 1985, the Blue Hill JV engaged in mine closure activities under the oversight of the Maine Department of Environmental Protection (DEP). SMF ¶ 83; RSMF ¶ 83. To fill and close the mines and to reduce metal leaching at the Site, waste rock from around the mine site was used as fill. SMF ¶ 84; RSMF ¶ 84. In 1985, the Maine DEP approved of the Site closure. SMF ¶ 86; RSMF ¶ 86.

Beginning in 2000, Kerramerican and its consultants conducted the remedial investigation (RI) of the Site and submitted a final RI report to DEP, in November 2002. DEP approved the report on December 18, 2002. SMF ¶ 91; RSMF ¶ 91. The RI report confirmed the presence of hazardous substances in the soils, sediments, surface water and groundwater at the Site. SMF ¶ 92; RSMF ¶ 92. Following DEP's approval of the RI report, Kerramerican conducted a feasibility study (FS) of the Site and submitted a FS report to DEP evaluating remedial options to address the contamination at the Site. DEP accepted and approved Kerramerican's FS, including acceptance of the remedies proposed by Kerramerican in the FS. The costs to design and implement those remedies are estimated at approximately $9 million. SMF ¶ 95; RSMF ¶ 95. On November 5, 2004, the State of

Maine initiated this action against Black Hawk, Denison and Kerramerican seeking reimbursement of past and payment of future response and oversight costs, as well as remediation of the Site and payment of damages to natural resources caused by hazardous substances at the Site. SMF ¶ 97; RSMF ¶ 97. On June 28, 2006, the Court approved a Consent Decree entered into between the state of Maine and DEP and Kerramerican and its predecessor and parent corporations, Keradamex and Falconbridge Limited, respectively. *Consent Decree* (Docket # 83). The Consent Decree provides that "[t]he costs to design and implement those remedies have been estimated at approximately $9 million." *Id*. at 9.

Kerramerican now moves for summary judgment against Denison on the sole issue of liability; Denison opposes it. *Kerramerican Mot. for Summ. J*. (Docket # 100) (*Kerramerican Mot*.); *Denison Opp'n to Kerramerican Mot. for Summ. J.* (Docket # 115) (*Denison Opp'n*).

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (internal citation omitted). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted). In applying this standard, the record is viewed in the light most favorable to the nonmoving party. *FDIC v. Anchor Props*, 13 F.3d 27, 30 (1st Cir. 1994).

### B. Operator Liability under CERCLA

The Supreme Court has commented, "CERCLA both provides a mechanism for cleaning up hazardous-waste sites . . . and imposes the costs of the cleanup on those responsible for the contamination." *Penn. v. Union Gas Co*., 491 U.S. 1, 7 (1989), overruled on other grounds, *Seminole Tribe v. Florida*, 517 U.S. 44 (1996).[5] The primary issue here is whether Denison was an operator of the Site for purposes of CERCLA liability.[6]

---

[5] Section 113 of CERCLA provides:

> (1) Contribution. *Any person may seek contribution from any other person who is liable or potentially liable under section 107(a)* [42 U.S.C. § 9607(a)], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a) [42 U.S.C. § 9607(a)]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107 [42 U.S.C. § 9606 or 9607].
>
> (2) Settlement. A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
>
> (3) Persons not party to settlement.
> (A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability
> (B) *A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek*

5

Kerramerican argues that "because Denison exercised pervasive control over the operations at the Site in the 1960s, directing activities that resulted in the disposal of the waste rock that is the principal cause of contamination at the Site, Denison is liable as an 'operator' under Section 107(a)(2) and applicable case law." *Kerramerican Mot*. at 18. Denison responds:

> Kerramerican fails to appreciate that not every action by an officer or employee of a parent involving a subsidiary's facility constitutes "operation" of that facility within the meaning of CERCLA. Operator liability arises *only* from actions related to waste disposal or environmental compliance; liability does not arise out of activities that are "consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."

*Denison Opp'n* at 4 (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)). Once again, both parties cite to *Bestfoods* at length to support their respective contentions. *See Denison Mem. in Supp. of Mot. for Summ. J*. (Docket # 91); *Kerramerican Objection to*

---

> *contribution from any person who is not party to a settlement referred to in paragraph (2).*

42 U.S.C. § 9613(f) (emphasis added).

[6] Section 9607(a) sets forth the scope of "covered persons" subject to CERCLA liability:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

42 U.S.C. § 9607(a).

6

*Denison Mot. for Summ. J.* (Docket # 113).  In its Order on Denison's motion for summary judgment against Kerramerican, the Court laid out the relevant legal framework in detail and it bears repeating:

### 1. *United States v. Bestfoods*

*Bestfoods* is the seminal case.  In *Bestfoods*, the Supreme Court set forth the issue and the answer:

> The issue before us, under [CERCLA], is whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary.  We answer no, unless the corporate veil may be pierced.  But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.

524 U.S. at 55.  The distinction, then, is whether Denison's involvement with the Site constituted active participation and control over the operations of Black Hawk or whether it constituted active participation and control over the operations of the facility itself.

*Bestfoods* began with the principle "deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *Id.* at 61 (internal punctuation omitted).  Nevertheless, *Bestfoods* offered a basis for CERCLA liability of a parent corporation, saying "nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 64.  In other words, if "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of," then the "parent is directly liable for its own actions." *Id.* at 64-65 (internal punctuation and citation omitted).

*Bestfoods* acknowledged that "[t]his much is easy to say; the difficulty comes in defining actions sufficient to constitute direct parental 'operation.' Here of course we may again rue the uselessness of CERCLA's definition of a facility's 'operator' as 'any person . . . operating' the facility." *Id*. at 66. The Court resorted to the "ordinary or natural meaning" of the term "operator" and defined it to mean "someone who directs the workings of, manages, or conducts the affairs of a facility." *Id*. Given CERCLA's particular concerns, an operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67.

*Bestfoods* rejected the "actual control test" – where the focus is on the relationship between the two corporations – instead focusing on "the parent's interaction with the subsidiary's facility." *Id.* at 67. *Bestfoods* explained that when considering whether a parent corporation may be held directly liable under CERCLA as an "operator," "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68. The Court went on to say that "[a]ny liabilities [the parent] may have as an *operator*, then, stem directly from its control over the plant." *Id*. (emphasis in original).

The Court also illuminated the proper analysis for individuals who are directors of both the parent and the subsidiary. The mere fact that the parent and subsidiary share common directors is insufficient to impose CERCLA liability on the parent, since "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* at 69. In fact, there is a "general presumption" that "directors are wearing their 'subsidiary hats' and

not their 'parent hats' when acting for the subsidiary [and] it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 69-70 (internal punctuation and citation omitted). To establish parental liability, the moving party would have to show that, despite this general presumption, the "officers and directors were acting in their capacities as [parent] officers and directors, and not as [subsidiary] officers and directors, when they committed those acts." *Id.* at 70.

### 2. *United States v. Kayser-Roth Corporation*

In *United States v. Kayser-Roth Corp.*, the First Circuit elaborated on *Bestfoods*. 272 F.3d 89 (1st Cir. 2001). *Kayser-Roth* discussed the *Bestfoods* reference to the "norms of corporate behavior" as a bellwether for distinguishing among differing fact patterns as well as *Bestfoods*' clarification that such norms would include the parent's "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Id.* at 100 (quoting *Bestfoods*, 524 U.S. at 72) (internal punctuation omitted). *Kayser-Roth* focused on *Bestfoods'* observation that the "the critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* (internal punctuation and citation omitted). *Kayser-Roth* noted that *Bestfoods* contains "an arguable ambiguity" in that, at one point, the Court "appears to link the operational inquiry to . . . environmental matters . . ." whereas, at other points, *Bestfoods* "articulates the relevant parent-facility relationship more broadly, suggesting an inquiry beyond the parent's direct involvement in pollution-related activities at the plant." *Id.* at 102. *Kayser-Roth* resolved this ambiguity by stating unequivocally that "we think it is clear that direct operator liability requires an ultimate finding of the parent's

9

involvement with 'operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'" *Id.* (quoting *Bestfoods*, 524 U.S. at 66-67).

*Kayser-Roth* concluded that the trial court's determination that the parent had engaged in "just this type and degree of activity" was sufficient to sustain parental liability under CERCLA. *Id.* at 100, 104. In particular, *Kayser-Roth* noted that the trial judge had found that the parent engaged in "pervasive control" of the subsidiary's affairs, including actions regarding environmental matters, such as the parent's approval of the installation of a scouring system that used trichloroethylene, its insistence that its subsidiaries notify the parent's legal department of any governmental or legal contact on environmental matters, and its involvement in the subsidiary's settlement of a prior environmental lawsuit. *Id.* at 92-93.

More notable, however, is *Kayser-Roth*'s focus on the activities of a particular employee of the parent. *Kayser-Roth* observed that one of the executive vice-presidents of the parent had "directly exerted operational control over environmental matters at the [subsidiary's] facility." *Id.* at 103. *Kayser-Roth* pointed out that, because the employee was not an officer or director of the subsidiary, he had "no hat to wear but the parent's . . ." *Id.* After describing in detail the role this vice-president played in the environmental decisions of the subsidiary, the district court found his range of activities to be "probative of Kayser-Roth's overall control over the handling of [the subsidiary's] pollution problems" and the First Circuit agreed. *Id.* at 104.

### 3. Denison's Involvement as a Parent Corporation

The critical concern is the roles of several employees working for both Denison and Black Hawk. Upon review of the record, the precise roles of these employees, as well as whether their actions were taken on behalf of Denison, Black Hawk, or both, remains unclear. *See Denison Opp'n* at 6-12. In its Order on Denison's motion for summary judgment, the Court has concluded that the only thing clear was that the exact nature of several Denison employees remained unclear. *See Order on Def. Denison Mot. for Summ. J.* at 11. There, the Court was constrained to view the evidence in the light most favorable to the non-moving parties Kerramerican and Black Hawk. Given their collective allegations concerning Denison's considerable involvement, the Court denied Denison's motion for summary judgment, finding that Denison's control over the Site created genuine issues of fact. The Court stated:

> A number of factual questions remain unresolved including the exact nature of the roles of multiple employees, whether those employees were acting on behalf of Denison, Black Hawk, or both, and whether their activities had to do with the leakage or disposal of hazardous waste, or compliance with environmental regulations. The Court easily concludes that there is a genuine issue of material fact that forecloses summary judgment to Denison.

*Id*.

The same unresolved issues of fact remain. Despite the enormous volume of filings by all parties, the Court simply does not know, with anything resembling accuracy, what Denison's involvement was. Here, however, the Court is constrained to view the evidence in the light most favorable to Denison, as the non-moving party. It may be, as Denison vigorously argues, that Denison's limited involvement does not give rise to operator liability under CERCLA. Indulging all reasonable inferences in favor of Denison, the Court is unable

to conclude that Denison is liable at this stage of the proceedings. At bottom, there is simply too much uncertainty to make a factual determination of Denison's liability for summary judgment purposes.

## III. CONCLUSION

The Court concludes that, given the uncertainty surrounding Denison's involvement at the Site, summary judgment imposing liability is improper.[7] Accordingly, the Court DENIES Kerramerican's Motion for Summary Judgment Against Denison Mines (Docket # 100).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of March, 2007

---

[7] Because the Court is denying the motion for summary judgment based on the questionable nature of certain employees' roles, the Court will not address Denison's additional arguments, such as "there is no proof in the record that any hazardous substances were disposed of at the Site during the period that Denison is alleged to have been an operator." *Denison Opp'n* at 16.